342 S.E.2d 453

**Faith W. COOK**

v.

**HECK'S INC., etc., M & W Dist., etc., et al.**

No. 16538.

Supreme Court of Appeals of West Virginia.

April 4, 1986.

James M. Cagle, Charles R. Garten, Charleston, for appellant.

Goodwin & Goodwin, Stephen P. Goodwin and Thomas R. Goodwin, Charleston, for appellees.

Fred Holroyd, Holroyd & Yost, Charleston, for amicus curiae.

McHUGH, Justice:

The appellant, Faith W. Cook, was terminated from her employment in June of 1983. She instituted a civil action in the Circuit Court of Putnam County against her former employer, M & W Distributing Co. (M & W), the parent company of M & W, Heck's, Inc. (Heck's), and various officers of Heck's and M & W. Her complaint alleged breach of contract, violation of *W. Va. Code*, 21–5–4, *et seq.* [1975], conspiracy, and intentional, reckless and malicious infliction of emotional distress. A jury trial commenced on May 25, 1984. Following presentation of the appellant's evidence, the trial court granted the appellees' motion for a directed verdict on all counts, except the statutory violation, and this appeal followed. The Court has before it the petition for appeal, all matters of record and the briefs and argument of counsel.

I

■ We review the evidence and the trial court's ruling in accordance with the well-established rule stated in syllabus point 1 of *Totten v. Adongay*, 175 W.Va. 634, 337 S.E.2d 2 (1985):

"Upon a motion to direct a verdict for the defendant, every reasonable and legitimate inference fairly arising from the testimony, when considered in its entirety, must be indulged in favorably to plaintiff; and the court must assume as true those facts which the jury may properly find under the evidence." Syl., *Nichols v. Raleigh-Wyoming Coal Co.*, 112 W.Va. 85, 163 S.E. 767 (1932).

*Accord*, syl. pt. 2, *Arcuri v. Great American Insurance Co.*, 176 W.Va. 211, 342 S.E.2d 177 (W.Va.1986).

*Facts*

The appellant, Faith W. Cook, began working for Heck's as a cashier in 1960.

She worked in various positions until 1977 when she went to work for M & W Distributors, a warehouse company that was a wholly-owned subsidiary of Heck's. From 1977 until her termination, Ms. Cook worked as a salesperson. In this position she was responsible for monitoring the inventory in several Heck's stores and handling the sales of goods from M & W's warehouse to Heck's. It was undisputed that Ms. Cook's performance record was excellent.

There was testimony that M & W distributed an employee handbook to its employees. A copy of this handbook, entitled "M & W And You," was introduced into evidence. It contained information concerning attendance policies, pay periods, retirement, insurance and other benefits, employee grievances, rules and disciplinary procedures. The section entitled "RULES AND DISCIPLINE PROCEDURES" contained a list of 41 separate offenses, together with the possible penalties for first, second or third infractions. The penalties ranged from written or verbal warning to suspension to discharge. Another section of the handbook, devoted to theft offenses, contained the following cross-reference to the list of rules and penalties: "IF YOU DO NOT FULLY UNDERSTAND ANY ONE OR MORE OF THESE RULES, DISCUSS THEM WITH YOUR MANAGER; DISREGARD FOR ANY RULE CAN BE CAUSE OF APPROPRIATE DISCIPLINARY ACTION. *FOR A COMPLETE LIST OF RULES AND DISCIPLINARY PROCEDURES, REFER TO THE LAST SECTION FO [sic] THIS BOOKLET.*" (emphasis added)

Ms. Cook's husband, Douglas, was the president of M & W. He was discharged from his employment in June of 1983.

Shortly thereafter, Robert Harrick, vice-president of M & W, whose duties included that of personnel manager, called Ms. Cook to inform her that she, too, was being terminated. Ms. Cook, who had been away on vacation, returned home to find a message on her answering machine to call Harrick. She telephoned Harrick who told her, without disclosing any reason, that she was

fired. Later Ms. Cook appeared at Harrick's office to demand a termination letter. Harrick dictated the following letter, which was typed and then given to Ms. Cook: "TO WHOM IT MAY CONCERN: This letter is to be used as a notice of termination for Faith Cook. She was terminated in the best interests of the company. Should any further information be necessary, please contact me at M & W Distributors. Respectfully, /s/ Bob Harrick, VP Sales."

As revealed through the trial testimony of Russell Isaacs, chairman of the board and chief executive officer of Heck's, Ms. Cook was fired because of her and her husband's association with Isaacs' predecessor, Fred Haddad, one of the founders of Heck's. Isaacs believed that Douglas Cook was involved with Haddad in an effort to purchase a chain of discount stores that Heck's was also trying to buy and that was then in competition with Heck's.

Ray Darnall, the president of Heck's, testified that he and Harrick had a conversation in which they decided that Faith Cook should, for the best interests of the company, be terminated. This decision was made after Ms. Cook's husband was fired. Isaacs testified that he agreed with the termination decision because he viewed the Cooks as competitors.

In response to a question about the significance of the rules and disciplinary procedures contained in the handbook, Fred Haddad testified: "These are things that we put in the procedures for any discharge of any employee, either one or more of these things have to happen before they are discharged." Douglas Cook, who had helped prepare "M & W And You" characterized the handbook as a "guide" for employees.

Haddad also testified that during his long association with Heck's no employee was fired without cause and that it was the policy of Heck's and its subsidiaries to discharge employees only for cause. According to Ms. Cook's testimony, employees were fired only for stealing. The trial judge expressly disbelieved the testimony that Heck's had only fired workers for theft offenses.[1]

There was conflicting evidence on the factual issue of whether the handbook applied to Ms. Cook. The appellant testified that she was given a copy of "M & W And You" shortly after she started to work for M & W. Haddad and Douglas Cook both testified that the handbook applied to all M & W employees. On the other hand, Harrick and Isaacs testified that the handbook covered only warehouse employees. The appellant testified that she was not a warehouse employee and was not subject to the supervision of the warehouse manager, who is described in the employee handbook as "the boss" of all warehouse employees.

## II

The appellant contends that the trial court erred in directing a verdict because her evidence established a *prima facie* case on each and every count of the complaint. We address each cause of action in turn to determine whether there was sufficient evidence to preclude a directed verdict.

### Breach of Contract

The appellant's principal contention is that the employee handbook, which was distributed to M & W employees, modified her contract of employment to make the contract not terminable at the will of the employer. We have not previously considered the question of whether job security guarantees, promises not to discharge except for cause, or express termination procedures contained in an employee handbook may be contractual provisions that

---

1. The following cases indicate that Heck's has fired workers for reasons other than theft, e.g., union activity. *Heck's, Inc. and Teamsters, Chauffeurs & Helpers Local Union No. 175, et al.*, 273 NLRB No. 34 (1984); *Heck's, Inc. and Dorothy B. Stulberg, Esq.*, 277 NLRB No. 98 (1985); *Food Store Employees Union, Local 347 v. NLRB,* 418 F.2d 1177 (D.C.Cir.1969); *NLRB v. Heck's, Inc.,* 398 F.2d 337 (4th Cir.1968), *rev'd on other grounds sub nom. NLRB v. Gissel Packing Co.,* 395 U.S. 575, 89 S.Ct. 1918, 23 L.Ed.2d 547 (1969); *NLRB v. Heck's, Inc.,* 387 F.2d 65 (4th Cir.1967).

abrogate the at will nature of the employment.

■ In the realm of the employer-employee relationship, West Virginia is an "at will" jurisdiction. *Wright v. Standard Ultramarine & Color Co.,* 141 W.Va. 368, 90 S.E.2d 459 (1955). Syllabus point 2 of *Wright* states: "When a contract of employment is of indefinite duration it may be terminated at any time by either party to the contract." The "at will" principle is not wholly unqualified, as we recognized in *Bell v. South Penn Natural Gas Co.,* 135 W.Va. 25, 31–32, 62 S.E.2d 285, 288 (1950): "Under the law governing the relation of master and servant, an employment, *unaffected by contractual or statutory provisions to the contrary,* may be terminated, with or without cause, at the will of either party." (emphasis added) *See also Shanholtz v. Monongahela Power Co.,* 165 W.Va. 305, 309, 270 S.E.2d 178, 181 (1980). We have thus recognized that contractual provisions relating to discharge or job security may alter the at will status of a particular employee.[2]

■ Generally, the existence of a contract is a question of fact for the jury. Syllabus point 5 of *Hallauer v. Fire Association,* 83 W.Va. 401, 98 S.E. 441 (1919), provides:

> Though the interpretation of contracts when made and free from ambiguity is a question for the court, the determination of whether the facts proved or admitted are such as to constitute an agreement binding the parties generally is within the province of the jury to ascertain from facts submitted for their consideration and judgment.

*See also Bowyer v. Knapp & Martin,* 15 W.Va. 277 (1879).

However, the trial court is justified in removing the issue from the jury's consideration where a *prima facie* case is lacking. " 'When the plaintiff's evidence, considered in the light most favorable to him, fails to establish a prima facie right of recovery, the trial court should direct a verdict in favor of the defendant.' Point 3, Syllabus, *Roberts v. Gale,* 149 W.Va. 166, 139 S.E.2d 272 (1964)." Syl. pt. 3, *Hinkle v. Martin,* 163 W.Va. 482, 256 S.E.2d 768 (1979). *See also* syl. pt. 4, *Troy Mining Corp. v. Itmann Coal Co.,* 176 W.Va. 599, 346 S.E.2d 749 (1986); *Totten̦ v. Adongay,* 175 W.Va. 634, ——, 337 S.E.2d 2, 3 (1985); syl. pt. 1, *Cox v. Galigher Motor Sales Co.,* 158 W.Va. 685, 213 S.E.2d 475 (1975).

Courts in other jurisdictions have recently held that an employer may be bound by promises, express or implied, in employee handbooks or policy manuals with respect to job security and termination procedures. *Toussaint v. Blue Cross & Blue Shield,* 408 Mich. 579, 292 N.W.2d 880 (1980); *Weiner v. McGraw-Hill, Inc.,* 57 N.Y.2d 458, 457 N.Y.S.2d 193, 443 N.E.2d 441 (1982); *Shah v. American Synthetic Rubber Corp.,* 655 S.W.2d 489 (Ky.1983); *Pine River State Bank v. Mettille,* 333 N.W.2d 622 (Minn.1983); *Leikvold v. Valley View Community Hospital,* 141 Ariz. 544, 688 P.2d 170 (1984); *Thompson v. St. Regis Paper Co.,* 102 Wash.2d 219, 685 P.2d 1081 (1984); *Woolley v. Hoffmann-La Roche, Inc.,* 99 N.J. 284, 491 A.2d 1257 (1985); *Ferraro v. Koelsch,* 124 Wis.2d 154, 368 N.W.2d 666 (1985); *Mobil Coal Producing, Inc. v. Parks,* 704 P.2d 702 (Wyo.1985); *Thompson v. American Motor Inns, Inc.,* 623 F.Supp. 409 (W.D.Va.1985). *See* annot., 33 A.L.R.4th 120 (1984).

In cases where employees have brought breach of contract actions based on discharge without cause, courts have examined employee manuals looking for promises of job security.

A policy manual that provides for job security grants an important, fundamental protection for workers. *See* F. Tanenbaum, *A Philosophy of Labor* 9 (1951), *quoted in* L. Blades, 'Employment at Will *vs.* Individual Freedom: on Limiting the Abusive Exercise of Employer Power,' 67 Colum.L.Rev. 1404, 1404 (1967). . . . If such a commitment is indeed made, obviously an employer should

---

**2.** *See Harless v. First National Bank,* 162 W.Va. 116, 246 S.E.2d 270 (1978), where we recognized the "public policy" exception to the doctrine of at will employment.

be required to honor it. When such a document, purporting to give job security, is distributed by the employer to a workforce, substantial injustice may result if that promise is broken.

*Woolley v. Hoffmann-La Roche, supra,* 99 N.J. at 297, 491 A.2d at 1264.

In *Thompson v. St. Regis Paper Co., supra,* the court held "that if an employer, for whatever reason, creates an atmosphere of job security and fair treatment with promises *of specific treatment in specific situations* and an employee is induced thereby to remain on the job and not actively seek other employment, those promises are enforceable components of the employment relationship." 102 Wash.2d at 230, 685 P.2d at 1088. (emphasis in original)

In *Woolley v. Hoffmann-La Roche, Inc., supra,* the Supreme Court of New Jersey examined a personnel policy manual distributed to employees of a large corporate employer. The court concluded that a promise of job security in a policy manual could be viewed as an offer for a unilateral contract and that the employees' continuing to work, when they were under no obligation to continue, would constitute both an acceptance of the offer and the necessary consideration to make the employer's promise binding and enforceable.

The Supreme Court of Minnesota has also applied a unilateral contract analysis to a personnel handbook in holding that an employer's promises in a handbook may be enforceable. *Pine River State Bank v. Mettille, supra.* "The employee's retention of employment constitutes acceptance of the offer of a unilateral contract; by continuing to stay on the job, although free to leave, the employee supplies the necessary consideration for the offer." 333 N.W.2d at 627.

Stating the proposition in general terms, some courts hold that at will employment status is not modified by personnel manuals where there are no promises by the employer that employment will continue for a definite period of time and no contractual or statutory limitations on the employer's right to terminate with or without cause. *White v. Chelsea Industries,* 425

So.2d 1090 (Ala.1983); *Johnson v. National Beef Packing Co.,* 220 Kan. 52, 551 P.2d 779 (1976); *Mau v. Omaha National Bank,* 207 Neb. 308, 299 N.W.2d 147 (1980); *Garcia v. Aetna Finance Co.,* 752 F.2d 488 (10th Cir.1984); *Enis v. Continental Illinois National Bank & Trust Co.,* 582 F.Supp. 876 (N.D.Ill.1984) (applying Illinois law); *Ruch v. Strawbridge & Clothier, Inc.,* 567 F.Supp. 1078 (E.D.Pa.1983) (applying Pennsylvania law).

This Court has clearly recognized the traditional elements of contract formation. Before a contract can be formed, there must be an offer and an acceptance. *General Electric Co. v. Keyser,* 166 W.Va. 456, 468, 275 S.E.2d 289, 296 (1981). The concept of unilateral contract, where one party makes a promissory offer and the other accepts by performing an act rather than by making a return promise, has also been recognized: "That an acceptance may be effected by silence accompanied by an act of the offeree which constitutes a performance of that requested by the offeror is well established." *First National Bank v. Marietta Manufacturing Co.,* 151 W.Va. 636, 641–42, 153 S.E.2d 172, 176 (1967).

Consideration is also an essential element of a contract. *First National Bank v. Marietta Manufacturing Co., supra,* 151 W.Va. at 642, 153 S.E.2d at 177; *North American Royal Coal Co. v. Mountaineer Developers, Inc.,* 161 W.Va. 37, 39, 239 S.E.2d 673, 675 (1977).

> Consideration has been defined as 'some right, interest, profit, or benefit accruing to one party, or some forbearance, detriment, loss, or responsibility given, suffered, or undertaken by another.' 17 Am.Jur.2d, Contracts, Section 85. A benefit to the promisor or a detriment to the promisee is sufficient consideration for a contract. 17 Am.Jur.2d, Contracts, Section 96.

*First National Bank v. Marietta Manufacturing Co., supra,* 151 W.Va. at 642, 153 S.E.2d at 177.

▪ Recognizing that a personnel manual may constitute a unilateral contract requires no radical departure from settled principles of contract law. At will employ-

ment status may be contractually modified, *Bell v. South Penn Natural Gas Co., supra,* either to establish a specific duration of the employment or to provide a measure of job security to covered workers. We agree with those courts that have found valuable consideration in the continued labor of workers who have in the past foregone their right to quit at any time. We conclude that a promise of job security contained in an employee handbook distributed by an employer to its employees constitutes an offer for a unilateral contract; and an employee's continuing to work, while under no obligation to do so, constitutes an acceptance and sufficient consideration to make the employer's promise binding and enforceable.

■ A common thread running through those cases where personnel manuals are viewed as contracts is the existence of a definite promise by the employer not to discharge the employee except for cause. For example, in *Toussaint v. Blue Cross & Blue Shield, supra,* the employer's policy manual stated that the company's policy was to discharge employees only for just cause. 408 Mich. at 597–98, 292 N.W.2d at 884. In *Weiner v. McGraw-Hill, Inc., supra,* the employee handbook stated that the company would discharge employees only for just and sufficient cause and only after an effort was made to rehabilitate the employee. 57 N.Y.2d at 460, 457 N.Y.S.2d at 194, 443 N.E.2d at 442. In *Shah v. American Synthetic Rubber Corp., supra,* the employee alleged that he had been promised by the employer that following completion of a 90-day probationary period, he could be discharged only for cause. 655 S.W.2d at 491. "The offer must be definite in form and must be communicated to the offeree." *Pine River State Bank v. Mettille, supra,* 333 N.W.2d at 626. In accordance with these and other authorities, we hold that an employee handbook may form the basis of a unilateral contract if there is a definite promise therein by the employer not to discharge covered employees except for specified reasons.

■ We have carefully read "M & W And You" and find in it evidence of a promise by the employer not to discharge those employees who are explicitly covered by the handbook, except for the offenses set forth in the handbook. The inclusion in the handbook of specified discipline for violations of particular rules accompanied by a statement that the disciplinary rules constitute a complete list is *prima facie* evidence of an offer for a unilateral contract of employment modifying the right of the employer to discharge without cause. We agree that "[n]o unilateral contract arises merely by the fact that [the employer] has alerted its employees that certain conduct may form the basis of a discharge." *Ruch v. Strawbridge & Clothier, Inc., supra,* 567 F.Supp. at 1081. However, it should be remembered that, by its own terms, the list of rules, the violation of which would be grounds for discharge, was described as a complete list. Under these circumstances, we conclude that the trial court erred in directing a verdict in favor of the appellees. As in most of the aforementioned cases from other jurisdictions, the jury as the trier of the facts must determine whether a unilateral contract exists in light of all the evidence presented in this case.

The jury must also decide whether a contract arising from the handbook specifically applied to Ms. Cook. As we observed in our review of the testimony, there was considerable conflict as to whether the appellant was covered by the provisions contained in the handbook. The evidence in this case relating to the applicability of the handbook to Ms. Cook is definitely not strong. Because of the trial court's threshold findings that the handbook did not constitute a contract, there was no further explicit finding on the applicability issue. However, the directed verdict compels us to view the evidence in the light most favorable to the appellant, *Totten v. Adongay, supra.* We therefore assume, only for purposes of this opinion, that the handbook was intended to apply to Ms. Cook. On remand there will be an opportunity for fuller evidentiary development by all parties.

If, on remand, the jury determines that there was, in fact, a contract between M &

W and Ms. Cook that limited M & W's right to terminate her without cause, the jury must also decide whether M & W breached the contract.

### Civil Conspiracy

The appellant alleged in her complaint that Heck's and M & W, together with Isaacs, Darnall and Harrick, engaged in a conspiracy to wrongfully, maliciously and illegally deprive her of her employment and benefits and that the conspiratorial plan was accomplished by wrongfully and illegally firing her. Based upon the finding that there was no contract, the trial judge found no evidence of conspiracy and he directed a verdict on this count in favor of the defendants.

On the subject of civil conspiracy, this Court has recently stated: "In order for civil conspiracy to be actionable it must be proved that the defendants have committed some wrongful act or have committed a lawful act in an unlawful manner to the injury of the plaintiff; ..." Syl. pt. 1, in part, *Dixon v. American Industrial Leasing Co.,* 162 W.Va. 832, 253 S.E.2d 150 (1979).

When the evidence is viewed in the light most favorable to the appellant, as it must be in reviewing a directed verdict, there clearly was sufficient evidence that Isaacs, Harrick and Darnall engaged in concerted action in deciding to fire Ms. Cook. Nonetheless, the only wrongful act alleged to be the purpose of the conspiracy was a breach of the alleged unilateral employment contract. There was, however, no evidence presented which showed that any of the defendants in deciding to terminate the appellant acted in any capacity other than an official one. A "conspiracy" requires at least two persons, *Dixon, supra,* 162 W.Va. at 834, 253 S.E.2d at 152, and a corporation can act only through its agents or employees. "Agents and employees of a corporation cannot conspire with their corporate principal or employer where they act in their official capacities on behalf of the corporation and not as individuals for their individual advantage." *Wise*

*v. Southern Pacific Co.,* 223 Cal.App.2d 50, 72, 35 Cal.Rptr. 652, 665 (1963). *Accord, Collins v. Union Federal Savings & Loan Association,* 99 Nev. 284, 303, 662 P.2d 610, 622 (1983). *See* 16 Am.Jur.2d *Conspiracy* § 55 (1979); *Ridgeway Coal Co. v. FMC Corp.,* 616 F.Supp. 404, 408 (S.D.W.Va.1985). Consequently, it is not necessary to decide whether there may be a viable theory of recovery based upon a conspiracy to breach a contract.

In the event no contract is found, the appellant contends that the defendants are liable for a civil conspiracy even in the absence of a contract, i.e., although the object of the conspiracy may have been lawful, the means used to achieve the end were unlawful. The appellant, relying on *Bull v. Logetronics,* 323 F.Supp. 115 (E.D.Va.1971), contends that "oppressive" means are the equivalent of "unlawful" means and that the evidence at trial of the defendants' oppressive conduct was sufficient to withstand a motion for directed verdict.

However, there was no evidence of concerted action to carry out the termination decision in any particular manner. Even if there were sufficient evidence of some oppressive conduct on the part of Harrick, who actually informed Ms. Cook of the discharge and dictated the termination letter, there was absolutely no evidence that any other defendant acted in concert with Harrick to plan the manner of termination.

For the foregoing reasons, we conclude that there was no actionable conspiracy.

### Outrageous Conduct

The appellant contends that the manner in which she was fired constituted actionable outrageous conduct which caused humiliaton, embarrassment, and deterioration of her health. The trial judge found there was insufficient evidence of outrageous conduct and directed a verdict on this issue in favor of the defendants.

Syllabus point 6 of *Harless v. First National Bank* 169 W.Va. 673, 289 S.E.2d

692 (1982), states: "One who by extreme and outrageous conduct intentionally or recklessly causes severe emotional distress to another is subject to liability for such emotional distress, and if bodily harm to the other results from it, for such bodily harm."

In *Harless*, we defined the parameters of the tort of outrageous conduct, in reliance on comment (d) to Section 46 of *Restatement (Second) of Torts* which provides that "the conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious and utterly intolerable in a civilized community."

█ The evidence in the case before us did not pass the Restatement's litmus test. Therefore, the trial judge's action in granting the motion for a directed verdict was proper.

### Punitive Damages for Statutory Violation

The trial judge determined that the defendants had violated the West Virginia Wage Payment and Collection law, specifically, *W.Va.Code*, 21–5–4(b) [1975], which provides: "Whenever a person, firm or corporation discharges an employee, such person, firm or corporation shall pay the employee's wages in full within seventy-two hours." The remedy available to the employee for such a violation is found in *W.Va.Code*, 21–5–4(e) [1975], which provides in pertinent part:

If a person, firm or corporation fails to pay an employee wages as required under this section, such person, firm or corporation shall, in addition to the amount due, be liable to the employee for

liquidated damages in the amount of wages at his regular rate of pay for each day the employer is in default, until he is paid in full, without rendering any service therefor: Provided, however, that he shall cease to draw such wages thirty days after such default. . . .

The appellant contends that the statutory violation entitled her to an award of punitive damages and that the court erred by not allowing the jury to consider such an award. The trial judge found no evidence of wanton, willful or malicious conduct and therefore directed a verdict in favor of the defendants.

█ Syllabus point 1 of *Wells v. Smith*, 171 W.Va. 97, 297 S.E.2d 872 (1982), provides:

"In actions of tort, where gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others appear, or where legislative enactment authorizes it, the jury may assess exemplary, punitive or vindictive damages; . . ." Syllabus Point 4, in part, *Mayer v. Frobe*, 40 W.Va. 246, 22 S.E. 58 (1895).

█ The corporate defendant was assessed a penalty of eight days' wages, in accordance with *W.Va.Code*, 21–5–4(e) [1975]. In the absence of a showing that the failure to pay the appellant's wages within 72 hours of her discharge was malicious, willful, wanton, reckless or criminally indifferent to the obligation to pay such wages, and in the absence of any statutory authorization, the defendant was not liable for any amount of damages in excess of the statutory penalty.[3]

---

**3.** The appellant, relying on *Wells v. Smith, supra,* also contends that she has an "independent" cause of action for punitive damages. This contention is without merit. While we held in *Wells* that punitive damages may be assessed against a tortfeasor where a jury does not award compensatory damages, we clearly do not recognize a cause of action for punitive damages unless it is based on some underlying wrongful

act involving gross fraud, malice, oppression, or wanton, willful, or reckless conduct or criminal indifference to civil obligations affecting the rights of others. *See Mauck v. City of Martinsburg*, 167 W.Va. 332, 280 S.E.2d 216 (1981), and *Harless v. First National Bank, supra.* Generally, punitive damages may not be awarded in a contract action. *Horn v. Bowen*, 136 W.Va. 465, 67 S.E.2d 737 (1951).

For the foregoing reasons, the final order of the Circuit Court of Putnam County is affirmed in part, reversed in part and remanded for further proceedings consistent with the principles set forth in this opinion.

Affirmed in part, reversed in part, and remanded.

NEELY, J., dissents on the grounds that he finds sufficient evidence to direct a verdict.